# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 21, 2024       Decided July 15, 2025

No. 23-5308

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01716)

*Kyle J. Tisdel* argued the cause for appellants. With him on the briefs were *Jason C. Rylander* and *Samantha Ruscavage-Barz*.

*Daniel Halainen*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Todd Kim*, Assistant Attorney General, and *Michael T. Gray*, Attorney.

*Sean Marotta* argued the cause for intervenors-appellees. With him on the joint brief were *Travis Jordan*, Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, *Catherine E. Stetson*, *Dana A. Raphael*,

*Steven J. Rosenbaum*, *Bradley K. Ervin*, *Bret A. Sumner*, *Malinda Morain*, *Eric Waeckerlin*, *Affie Ellis*, *Sarah C. Bordelon*, *Hadassah M. Reimer*, *Kristina (Tina) R. Van Bockern*, *Nikesh Jindal*, *Daniel S. Volchok*, *Andrew C. Lillie*, *Mark D. Gibson*, *Kathleen C. Schroder*, *Mark Champoux*, *Andrew C. Emrich*, *Thomas L. Sansonetti*, and *Bryson C. Smith*. *Joseph Meyer*, *D. David DeWald*, Attorney, Office of the Attorney General for the State of Wyoming, *Robert J. Lundman*, Attorney, U.S. Department of Justice, and *Ryan A. Smith*, entered appearances.

Before: PILLARD, WILKINS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:    From January 2021 to August 2022, the Bureau of Land Management approved more than 4,000 permits for oil and gas wells on public land in the Permian Basin of southeast New Mexico and the Powder River Basin of northeast Wyoming.  Plaintiff environmental organizations have challenged all those permit approvals, alleging that BLM failed to adequately consider the climate and environmental justice impact of the disputed wells.  The district court held that plaintiffs lacked standing and dismissed the claims.

On appeal, the plaintiff organizations assert standing based on affidavits recounting that their members live, work, and recreate in the general vicinity of the permitted drilling sites and consequently suffer a variety of injuries to their health, safety, and recreational and aesthetic interests.  But Plaintiffs have failed to sufficiently link those harms to the discrete agency actions they seek to reverse.  Rather than explain how one or more of the challenged permits would likely injure them, as Article III requires, Plaintiffs have instead pursued an all-or-

nothing theory that claims standing to challenge all the permits in the aggregate—whether for wells within a couple of miles from where they live, work, or play, or for those more than 50 miles away. They alternatively claim standing based on calculations of the wells' overall contribution to global climate change, and on an asserted organizational injury resulting from the government's failure to publicize information about climate change. Those theories, too, are barred by our precedent. We therefore affirm the district court's judgment of dismissal.

## I.

## A.

The Bureau of Land Management (BLM or the Bureau), an agency within the U.S. Department of the Interior, is authorized by the Mineral Leasing Act, 30 U.S.C. § 181 *et seq*., to issue leases granting private parties the right to extract oil, gas, and other natural resources from public lands, *id.* § 181. The Bureau opens public lands to such private use through a three-stage process—land-use planning, leasing, and drill permitting—outlined by the Mineral Leasing Act, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq*., and various federal regulations.

Under that process, BLM first prepares a Resource Management Plan setting a general strategy and objectives for a particular area of public land. *Id.* § 1712; 43 C.F.R. § 1601.0-5(n).[1] That Plan identifies which portions of the land will be open to private leasing for oil and gas development. 43 U.S.C. § 1712(a). Second, BLM leases eligible individual parcels of land through a competitive auction. 43 C.F.R §§ 3120.5-1, 5-

---

[1] Some of the applicable regulations were revised during the course of this litigation. We generally cite the version of the regulations in effect at the time of the challenged action.

3 (2022); 30 U.S.C. § 226(b)(1)(A). Third, before a successful lessee commences drilling, it must submit to BLM for its approval an Application for Permit to Drill (APD or permit) a proposed oil or gas well. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2022). Throughout those stages, BLM must comply with federal environmental statutes including, as relevant here, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq*, and the FLPMA.

NEPA requires federal agencies "to consider and report on the environmental effect of their proposed actions." *WildEarth Guardians v. Jewell* (*WildEarth 2013*), 738 F.3d 298, 302 (D.C. Cir. 2013). Specifically, an agency must prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). By regulation, all approvals of Resource Management Plans are considered "major Federal actions" and must be accompanied by an EIS. 43 C.F.R. § 1601.0-6. However, not every federal action requires an EIS; an action that is "not likely to have significant effects" can instead be examined by a less in-depth "environmental assessment." 40 C.F.R. § 1501.3(a)(2) (2022). The Bureau conducted only environmental assessments of the individual APDs challenged in this case rather than separate EISs for each one, although these environmental assessments incorporate analysis from earlier EISs more broadly analyzing effects of oil and gas development in New Mexico and Wyoming. *See, e.g.,* Environmental Assessment: Titan Exploration LLC Nine Mile T41R74S22SWSE Oil and Gas Well Pad, at 2 (J.A. 751).

Section 7 of the ESA obliges federal agencies to ensure "that any action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or

result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). If an agency determines that a proposed action "may affect listed species or critical habitat," 50 C.F.R. § 402.14(a) (2022), it must engage in "consultation" with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (the Services). *Id.*; *Growth Energy v. EPA.*, 5 F.4th 1, 26 (D.C. Cir. 2021) (per curiam). Pursuant to that consultation, the relevant Service develops a "biological opinion" that assesses "whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4) (2022).

The FLPMA, for its part, declares "the policy of the United States that . . . the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). To that end, the Act directs BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

**B.**

In June 2022, plaintiffs Center for Biological Diversity (CBD or Center) and WildEarth Guardians, later joined by plaintiffs Citizens Caring for the Future and New Mexico Interfaith Power and Light, filed suit in the United States District Court for the District of Columbia against the U.S. Department of the Interior, the Secretary of the Interior, BLM, and the Bureau's Director (Federal Appellees). Plaintiffs ultimately challenged every permit to drill approved between January 21, 2021, and August 31, 2022, by any of four BLM Field Offices—Carlsbad or Roswell in New Mexico's Permian

Basin, and Casper or Buffalo in Wyoming's Powder River Basin. Am. Compl. ¶ 102 (J.A. 125-26).

Plaintiffs alleged that BLM authorized at least 4,019 qualifying APDs over that twenty-month period, and they appended to their complaint a full list of the permits they challenged. Critically, this case does not challenge any Resource Management Plan or leasing decision—although some of the Plaintiffs in this case have filed other litigation to challenge the Bureau's leasing authorizations in the relevant regions. *See WildEarth Guardians v. Bernhardt*, 501 F. Supp. 3d 1192 (D.N.M. 2020) (holding that plaintiffs had standing to challenge leasing of drilling rights on land in the Carlsbad region in 2017 and 2018 but that the leasing did not violate NEPA). Instead, Plaintiffs claim here that the Bureau's issuance of the challenged permits themselves violated NEPA, the ESA, and the FLPMA.

Plaintiffs' Amended Complaint includes five counts. All are brought under the Administrative Procedure Act (APA), as neither NEPA nor the FLPMA creates a private right of action, *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010), and judicial review of agency action under the ESA is also governed by the APA, *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005). First, Plaintiffs claim that BLM's permit approvals violated NEPA because the environmental assessments accompanying the approvals all failed to take a "hard look" at the oil and gas wells' cumulative greenhouse gas emissions and resulting climate impacts. Second, they claim the Bureau's failure to properly consider the environmental justice impacts of the challenged permit approvals also violated NEPA. Plaintiffs' next two claims allege that BLM violated the ESA by failing to properly consult with the Services about the APD

approvals' impacts on species threatened by climate change, and by failing to reinitiate consultation on the relevant Resource Management Plans, and so acted arbitrarily and in derogation of its duty to protect listed species and critical habitat. Finally, Plaintiffs claim that, in approving the challenged permits, BLM failed to prevent unnecessary or undue degradation of public lands in violation of the FLPMA. Plaintiffs request that the court vacate and set aside all the challenged Permit approvals and enjoin Federal Appellees from permitting any further drilling until BLM complies with the relevant statutes.

A group of oil and gas industry associations and companies holding the challenged permits (Intervenors), as well as the state of Wyoming, successfully moved to intervene to defend BLM's permit approvals. Intervenors then moved to dismiss arguing, among other things, that Plaintiffs lacked standing to challenge the permit approvals because they had not alleged any concrete and particularized injury linked to the APDs at issue.

In opposition to the motion to dismiss, Plaintiffs offered three distinct theories of standing, each supported by supplemental declarations filed by Plaintiffs' individual members and officers:

First, they claimed associational standing for their NEPA and FLPMA claims because their members lived, worked, and recreated in two "APD Areas"—a term Plaintiffs coined to refer to areas they define by imagined boundary lines—one encompassing all the challenged APDs in New Mexico and one encompassing all the challenged APDs in Wyoming. Plaintiffs averred that their members' health and their aesthetic, recreational, and other interests are harmed by air pollution, light pollution, traffic, and landscape effects associated with

8

each group of wells. They relied primarily on the Tenth Circuit's decision in *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019) (*Diné CARE*), which held that a plaintiff organization had standing to challenge more than 300 APDs in New Mexico based on alleged harms to users of the area affected by oil and gas activity. Plaintiffs told the district court in this case that, under the logic of *Diné CARE*, they were not required to "catalog discrete injuries from each discrete APD across the 4,000+ at issue" or "catalog harm and geo-nexus to 4,000+ wells." Conservation Groups Mem. in Support of Response to Mot. to Dismiss 11-12 (Conservation Groups Mem.) (J.A. 496-97).

Second, as to their ESA claims, Plaintiffs asserted associational standing because their members observed and studied wildlife facing threats from climate change that would be exacerbated by emissions from the wells. The identified affected species included songbirds in Hawaii, squirrels in Arizona, butterflies in California, and coral reefs in Fiji.

Third, CBD claimed organizational standing for its ESA claims on the ground that BLM's failure to engage in the required ESA consultation deprived it of information about federal agency actions' impact on species and so harmed its ability to fulfill its organizational mission.

The district court granted Intervenors' motion to dismiss on the ground that Plaintiffs lacked standing. Emphasizing that Plaintiffs must demonstrate standing for each challenged APD, the court held that Plaintiffs had only claimed a "geographic nexus to the broad 'APD Areas' [that] Plaintiffs created" and therefore failed to assert "any individual member's geographic nexus to any specific wells or drilling sites." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 22-cv-01716, 2023 WL 7182041, at *4 (D.D.C. Nov. 1, 2023). The

district court distinguished *Diné CARE* as having "challenged an agency action stemming from a single [EIS]," whereas Plaintiffs here failed to identify any "single underlying agency action applicable to the challenged [permit] approvals." *Id.* at *5.

The district court also held that CBD lacked organizational standing for the ESA claims, concluding it had failed to tie "its mission of protecting species to any particular [APD] approval," or explain "how its resource needs would change in response to the approvals." *Id.* at *4. The court did not separately analyze Plaintiffs' associational standing arguments for their ESA claims based on their members' interests in species harmed by climate change.

Plaintiffs timely appealed. We have appellate jurisdiction under 28 U.S.C. § 1291.

## II.

We review *de novo* the district court's judgment of dismissal for lack of standing and, "[i]n determining standing, we may consider materials outside of the complaint." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Because this case is before us at the pleading stage, we accept as true the well-pleaded factual allegations in the complaint or in declarations submitted in support of standing, draw all reasonable inferences in plaintiffs' favor, and "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (formatting modified); *see also Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023).

The Constitution limits the federal judicial power to individual cases and controversies, and a proper case or

controversy requires at least one plaintiff to demonstrate that she has standing to sue. *Murthy v. Missouri*, 144 S. Ct. 1972, 1985-86 (2024). Standing necessitates an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). That injury may result from an agency action that failed to follow some statutorily required procedure, such as completing NEPA environmental review or engaging in ESA consultation prior to undertaking a specific action. *WildEarth 2013*, 738 F.3d at 304-05; *Growth Energy*, 5 F.4th at 27.

For claims of procedural injury under NEPA and the ESA, the imminence and redressability prongs of standing are somewhat relaxed. *See Growth Energy*, 5 F.4th at 27; *see also Ctr. for L. and Educ. v. U.S. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation."). For causation, a plaintiff "must show two links: one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of [compliance with] that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." *Growth Energy*, 5 F.4th at 27 (internal quotation marks omitted). For redressability of a procedural injury, a plaintiff need not show that "compliance with the procedure *would* alter the final agency decision," but only that the agency "*could* reach a different conclusion if ordered to revisit its procedural error." *Id.* at 27-28 (formatting modified). However, even a plaintiff claiming procedural injury must show how the agency's error

could affect her "concrete interests." *Id.* at 27. "Unless there is a substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc) (formatting altered). To have such a particularized interest, a plaintiff "must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Lujan*, 504 U.S. at 566 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-88 (1990)).

A plaintiff "must demonstrate standing for each claim [it] seeks to press" and "for each form of relief sought," even if the various claims are derived from similar facts or raise similar legal questions. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (formatting altered). In both the district court and here, Plaintiffs have resisted this basic principle. Before the district court, Plaintiffs denied any obligation to identify a "harm and geo-nexus" to the specific permits they sought to challenge. Conservation Groups Mem. 12-13 (J.A. 497-98). And in their opening brief to our court, Plaintiffs maintained that *Diné CARE* relieved them of their burden "to establish standing for each well individually." Conservation Groups Br. 15.

Federal Appellees acknowledge that plaintiffs may use "common allegations or evidence to establish standing to challenge multiple agency actions," such as alleging "recreational or aesthetic harms that are fairly traceable to multiple permits." Federal Appellees Br. 19. As Federal Appellees observed before the district court, a plaintiff "may define the 'affected area' for each APD in any number of overlapping ways, such as by visual site [sic] lines, relevant air

sheds, or anticipated range of resulting noise pollution." Defs' Resp. to Def-Intervenors' Mot. to Dismiss 13 (J.A. 477). But even when established with common support, their standing depends on a showing of injury, causation, and redressability that implicates each individual challenged APD. Federal Appellees Br. 19; Intervenors Br. 25-30.

When pressed at argument, even Plaintiffs ultimately recognized their duty to establish standing for every permit and therefore to allege how all the challenged APDs contribute to their injury in fact. Oral Arg. Tr. 5:15-6:20. We proceed to assess Plaintiffs' proffered theories of standing under that basic framework to determine whether they have met their pleading-stage burden to plausibly allege standing. *See Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).

## III.

Plaintiffs offer two theories of "associational" or "representative" standing based on the injuries incurred by their individual members. To claim associational standing, Plaintiffs must show that (1) at least one of their members would have standing to sue in their own right, (2) the interests the members seek to protect are germane to their organizations' purposes, and (3) the members need not participate individually in the lawsuit. *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1032 (D.C. Cir. 2023) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Only the first prong—the Article III standing of Plaintiffs' individual members—is at issue here. Because Plaintiffs have failed to demonstrate that any individual member would plausibly have standing to challenge any or all

the APDs under either of the two theories, we hold that they lack associational standing.

**A.**

Plaintiffs first argue that they have associational standing for their claims that the permit approvals violated NEPA and the FLPMA because their individual members attested that they experience a variety of harms within Plaintiffs' self-defined "APD Areas" that they allege are caused by oil and gas development and will be intensified by the authorization of the disputed wells. It is well established that environmental plaintiffs adequately allege standing "when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks omitted). We have, for example, found standing when plaintiffs made recreational use of waters and coastlines where the Department of the Interior granted leases for oil and gas development, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015), and when plaintiffs had aesthetic and recreational interests in lands where BLM had offered leases for mining because pollution threatening those interests "follow[ed] inexorably" from the challenged agency action, *WildEarth 2013*, 738 F.3d at 305-06. *See also Calif. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (finding standing because reasonable fear of harm from hazardous waste pollution caused petitioners reduced enjoyment of the outdoors); *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180-82 (D.C. Cir. 2025) (finding standing based on safety risks and "increased disruption to [] peace and quiet" caused by increased rail traffic) (internal quotation marks omitted); *Sierra Club v. FERC*, 867 F.3d

1357, 1365-66 (D.C. Cir. 2017) (finding standing based on noise pollution).

To support their standing, Plaintiffs primarily rely on declarations submitted by Kayley Shoup and Rebecca Sobel as to New Mexico and Jeremy Nichols and Erik Molvar as to Wyoming, each of whom is a member of at least one plaintiff organization. The declarations discuss in detail the injuries sustained by Plaintiffs' members within the APD Areas as a result of oil and gas development, including exposure to smog, haze, and pollutants harmful to human health and public welfare (traceable to an array of emissions, including particulate matter, ozone, benzene ethylene, toluene, and xylene), the degradation of the appearance of public lands by oil and gas infrastructure, noise pollution and dangerous roads caused by increased heavy truck traffic, earthquakes linked to hydraulic fracking, and the disturbance of local wildlife. They explain how those effects can be felt in specific locations where Plaintiffs' members have lived, worked, or recreated. And they assert their members' intent to return to those places in the future.

There is no dispute that Plaintiffs' declarations present, as Federal Appellees concede, "the kinds of submissions that often support standing to challenge a particular project." Federal Appellees Br. 28. Together, they readily demonstrate that Plaintiffs' members are among those who use the areas described in the affidavits and whose health, safety, aesthetic, or recreational interests are likely to be harmed by oil and gas activity that affects those locations. *See Laidlaw*, 528 U.S. at 183. The problem for Plaintiffs is that they have not alleged whether or how the newly permitted wells will cause those harms at the locations they identify as where they live, work, or travel. Plaintiffs cannot rely on allegations of the kinds of concrete harms generally associated with oil and gas extraction

to challenge permits for oil and gas extraction across thousands of square miles of New Mexico and Wyoming without linking their experience of those harms to the challenged permits—by, for example, identifying the nature and range of the wells' impact(s).

As we have emphasized, Plaintiffs' claims require that they trace their injury to the drilling permits they seek to challenge. To attempt to do so, Plaintiffs describe their members' nexus only to an "APD Area" in each state, which Plaintiffs define as the region created by "drawing a line around where the challenged wells will be drilled" in each state on maps created by Plaintiffs for this litigation. *See* Shoup Decl. ¶ 13 (J.A. 530); Clauser Decl. Exs. 1-A, 1-B, 1-C, 1-D (J.A. 519-26). Generally speaking, given the dispersion of the New Mexico wells at issue, as depicted in Figure 1, the APD Area apparently spans more than 80 miles from north to south, and a similar distance from east to west to include all the permitted well sites. The area encompassing all the wells in Wyoming, depicted in Figure 2, is even larger.



*Fig. 1:* Clauser Decl. Ex. 1-B (J.A. 522), depicting the
challenged APDs in New Mexico.



*Fig. 2:* Clauser Decl. Ex. 1-D (J.A. 526), depicting the
challenged APDs in Wyoming.

The relevant declarations do identify specific locations where Plaintiffs' members have experienced harms linked to oil and gas development, such as Carlsbad Caverns National Park in New Mexico and portions of Thunder Basin National Grassland in Wyoming. But they fail to demonstrate causal links between harms at those locations and the APD approvals that Plaintiffs seek to reverse. For example, Shoup resides in Carlsbad—within the New Mexico APD Area—and her declaration alleges that oil and gas wells cause haze that affects her recreational activities in and around the city. Shoup Decl. ¶¶ 12, 15, 18 (J.A. 530-31, 534). However, she does not allege which challenged permits will likely cause or contribute to those harms. Plaintiffs simply contend that all of them will, without sufficiently explaining the reach of the wells' effects— individually or together—to make that contention plausible or amenable to meaningful review.

It seems likely that the challenged wells located closest to Shoup's home or to the identified roads and places she frequents will contribute to haze affecting her, but the record offers no means for us to confirm as much—particularly as to Plaintiffs' claims extending to permits to drill wells at distances of 10, 20, or 50 miles from Carlsbad. Plaintiffs' declarations do not, for example, describe the geographic reach of any individual well's likely contribution to the various types of harmful effects—haze, noxious emissions, visual blight on the landscape, noise and light pollution, increased heavy vehicle traffic, and seismic activity—that they ascribe to oil and gas development. And they do not specify which of Plaintiffs' members routinely recreate within the reach of those particularized effects. To the contrary, Plaintiffs fail to assert the geographic extent of any of the injuries allegedly caused by any of the challenged APDs. They thus give us no basis to credit their claims that wells at varying distances from where they live, work, and recreate cause their identified harms.

The point is not that we question whether the asserted harmful effects extend beyond the specific well sites, but that Plaintiffs have provided no information at all as to how far they typically extend. For example, plausible allegations that drilling at a permitted site typically emits stench or noxious chemicals for an 80-mile radius would presumably suffice to establish that drilling inflicts those harms on persons anywhere within Plaintiffs' New Mexico APD area; a smaller radius would require allegations that Plaintiffs experience effects at various specified locations within sufficient proximity to subsets of the wells. But Plaintiffs allege only generally that a "rotten-egg smell of hydrogen sulfide" is common across the APD Area, without providing information that would allow us to assess whether and where the newly permitted wells they challenge will plausibly contribute to that effect. *Id.* ¶ 22 (J.A. 535).

To take another example, Plaintiffs might trace new wells to visible blight by alleging that the size of the typical drilling apparatus and the sightlines around identified groups of permitted drill sites make them visible to at least one of the Plaintiffs from the roads or other locations where they travel, live, or visit. Instead, Plaintiffs' visibility claims are more general: The Nichols Declaration, for instance, avers that the wells' effect on the landscape "would be visible from many public lands vantage points in the region where [he] ha[s] recreated and plan[s] to recreate," Nichols Decl. ¶ 27 (J.A. 562), but makes no effort to identify which permitted wells' effects would be visible from which locations.

Without such information as to the ambit of any of the asserted effects of the permitted wells, we cannot determine whether it is plausible that any individual APD likely interferes with Nichols' or any other member-affiant's recreational interests in any particular place. That question turns on the

scope of an asserted effect, which may be influenced by associated variables like air currents or the specific topography or sightlines across New Mexico and Wyoming. We need not speculate as to what facts would suffice to establish that a given type of effect of the permitted activity likely injures Plaintiffs. It is dispositive that all of Plaintiffs' supporting materials are silent on the critical question of which APDs are alleged to cause which harms in which of the locations Plaintiffs frequent, leaving us unable meaningfully to review their claims that all the challenged agency actions will likely cause them harm.

Plaintiffs cannot overcome this fatal defect by treating the permits as if they were a single action affecting a unitary APD Area, without information that the effect of any one well on any plaintiff anywhere in that vast area suffices to support their challenge to the entire batch. As each APD is a distinct agency action, plaintiffs must establish standing as to each. *See Murthy*, 144 S. Ct. at 1988 ("plaintiffs must demonstrate standing for each claim they press . . . and for each form of relief that they seek") (internal quotation marks omitted); *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1204-05 (D.C. Cir. 2020) (plaintiffs must prove standing for each "discrete regulatory action" based on the "discrete effects" of that action). The fact that Plaintiffs have elected to combine their claims against more than 4,000 APDs into one case does not convert the separate permitting actions into a single federal agency action.

Moreover, the use of an "APD Area" as a shortcut for standing, untethered to any information about the range of the challenged wells' effects, lacks a limiting principle. At oral argument, Plaintiffs' counsel accepted that their declarations would not suffice to demonstrate standing to challenge a hypothetical additional well 50 miles north of Roswell, New Mexico, Oral Arg. Tr. 19:1-16, even though Plaintiffs could

easily have drawn an "APD Area" to contain such a well and recited the same list of harms caused by oil and gas development affecting their activities within that APD Area. That well-advised concession demonstrates the weakness of Plaintiffs' theory of standing. If that hypothetical well is too far-flung for Plaintiffs to challenge based on the record in this case, why is the same not true for the widely dispersed wells they do seek to challenge? Because Plaintiffs neglect to identify the geographic ambit of the harms caused by an agency decision to approve an APD, Plaintiffs ultimately offer no way to distinguish their standing to challenge the APDs at issue here from their standing relative to any other permit in New Mexico, Wyoming, or elsewhere.

Our holding should not be understood as obliging Plaintiffs to submit a voluminous complaint featuring separate, duplicative allegations for each of the 4,000 challenged wells. As Federal Appellees have acknowledged, Plaintiffs may "define the 'affected area' for each APD in any number of overlapping ways." Defs' Resp. to Def-Intervenors' Mot. to Dismiss 13 (J.A. 477). And they may, where appropriate, "rely on common allegations or evidence to establish standing to challenge multiple agency actions," such that the allegations supporting standing to challenge different permits "may overlap to a significant degree, or even entirely." Federal Appellees Br. 19. For example, Plaintiffs might allege that a well causes a cognizable type of harm—such as smog, ozone, or stench—within a specified radius. Allegations that one of their members recreated at a single location within the overlapping radii of more than one well could suffice to demonstrate "concrete and particularized injury . . . *due to* geographic proximity to the action[s] challenged that gives rise to Article III standing" to challenge multiple permits. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002).

The point is that Plaintiffs must somehow establish an injury in fact traceable to every challenged well. On this record as Plaintiffs describe it, different parts of the APD Area may or may not be distinctly affected by some or all of the challenged approvals. They cannot simply assert that their members' presence in a large APD Area automatically grants standing to challenge every APD listed in the complaint. Plaintiffs object that it is incongruous to require them to identify injury from each permit when BLM's own permitting process ignores any such "site-specific" differences across wells. Reply Br. 11. As discussed above, each of the permits challenged in this case is accompanied by a brief "environmental assessment," rather than a full EIS. Instead of conducting a full analysis of the anticipated environmental harms of each APD based on those wells' individual characteristics and exact locations, the Bureau's own environmental assessments largely "tier" back and incorporate by reference a relatively detailed but shared analysis of the effects of oil and gas production that accompanied earlier agency actions, such as a Resource Management Plan. *See, e.g.,* Environmental Assessment: Titan Exploration LLC Nine Mile T41R74S22SWSE Oil and Gas Well Pad, at 2 (J.A. 751). Indeed, BLM's pace of operations—approving over 4,000 challenged permits over a twenty-month period—essentially foreclosed the Bureau from creating a tailored environmental analysis for each well.

If Plaintiffs are correct that BLM has failed to properly account for the cumulative impacts of the wells—and we take no position on the merits of Plaintiffs' arguments at this stage of the proceedings—that might mean that each of the challenged permits violates NEPA for the same reason, such as a failure to consider the "incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1(g)(3) (2022). Even if the challenged permits all suffer from the same legal defect,

however, the Constitution requires Plaintiffs to demonstrate an injury linked to each distinct federal action.

Plaintiffs urge us to follow the Tenth Circuit in *Diné CARE*, which considered and rejected similar objections to an analogous factual showing in support of standing to challenge hundreds of drilling permits. In *Diné CARE*, environmental organizations (including one of the plaintiffs in this case) brought a wholesale challenge to the grant of approximately 350 APDs in the Mancos Shale in the Greater Chaco region of northeast New Mexico. *Diné CARE*, 923 F.3d at 835, 838 n.2. The *Diné CARE* plaintiffs' standing affidavits described their members' activities in various locations in the Greater Chaco region and their exposure to traffic, foul odors, light pollution, and other harms resulting from oil and gas activity. *Id.* at 842.

The Tenth Circuit sustained plaintiffs' standing, rejecting the government's argument that plaintiffs had failed to "establish standing for each challenged APD approval" with affidavits that only "refer[red] generally to the 'greater Chaco region' or the 'Mancos Shale formation'" instead of individual well sites. *Id.* (formatting altered). It emphasized that no court had "ever required an environmental plaintiff to show that it has traversed each bit of land that will be affected by a challenged agency action." *Id.* (quoting *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013)). The Tenth Circuit concluded that plaintiffs' use of maps to show the geographic proximity of the well sites to locations where their members lived and recreated, combined with the nature of plaintiffs' challenge to the "indirect and cumulative impacts of the APDs" extending "beyond the boundaries of the well sites and into the greater Chaco landscape," sufficed to demonstrate the required injury in fact. *Id.* at 842-43.

24

We acknowledge that the allegations and affidavits in support of standing in *Diné CARE* bear a strong resemblance to those in this case—unsurprisingly so, given the overlap in parties, attorneys, and declarants in the two cases. The district court here distinguished *Diné CARE* as challenging one agency action encompassing all the permits. 2023 WL 7182041, at *5. That does not appear to be quite right: The Tenth Circuit understood that the plaintiffs' claims were "in the form of challenges to numerous individual APDs," rather than to a common agency action underlying all the wells (such as a Resource Management Plan or leasing decision). *Diné CARE*, 923 F.3d at 843. In our view, *Diné CARE* is not distinguishable in the way the district court thought.

Nonetheless, we agree that our decision is not clearly in conflict with *Diné CARE*. The Tenth Circuit itself provides a more modest and defensible reading of *Diné CARE* than Plaintiffs urge here, suggesting that its plaintiffs' standing rested not just on their identification of activities in a large region some part of which was affected by the challenged APDs, but on the fact that those plaintiffs "regularly visited near the well sites and thus established a 'geographic nexus to the site'" of the permits they sought to challenge. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1153 (10th Cir. 2022) (formatting altered) (quoting *Diné CARE*, 923 F.3d at 841). The scope of the challenge here is much broader, involving more than ten times as many APDs spread over what appear to be substantially larger areas in two different states. *Compare* Clauser Decl. Exs. 1-A, 1-B, 1-C, 1-D (J.A. 519-26), *with* Dorsey Decl. Ex. A, *Diné CARE*, 923 F.3d 831 (*Diné CARE* J.A. 423) (mapping the challenged APD locations in *Diné CARE*).

The Tenth Circuit's decision is in any case not binding on this court, and to the extent that *Diné CARE* confers standing

to challenge multiple agency actions without a demonstrated injury caused by each action, as Plaintiffs contend, we must reject it as inconsistent with precedent binding on this court. For the reasons discussed above, Plaintiffs cannot establish standing without demonstrating the requisite causal link between the challenged drilling permits and the concrete harms they identify.

The district court described the defect in Plaintiffs' arguments as a failure to "allege a cognizable injury in fact." 2023 WL 7182041, at *5. But, as we have emphasized, the injuries described in Plaintiffs' declarations could suffice to show standing to challenge the permits they identify if they were to specify the causal mechanism connecting their harms to the individual agency actions. We therefore affirm the judgment of the district court dismissing all of Plaintiffs' NEPA and FLPMA claims on the alternative ground that Plaintiffs have failed to show the requisite causal link between a "substantive government decision that may have been wrongly decided" and "the plaintiff's particularized injury" needed to support their standing. *Growth Energy*, 5 F.4th at 27 (internal quotation marks omitted).

We will not at this stage comb through Plaintiffs' declarations and supporting materials to attempt to ascertain whether their asserted injuries can be plausibly traced to at least some of the permits at issue, even if not all of them. Plaintiffs, who "bear the burden to establish standing by setting forth specific facts," *Murthy*, 144 S. Ct. at 1991 n.7 (formatting altered), have persisted throughout this case with an "all-or-nothing" theory of standing. They do not explain how they might still have standing even if their more expansive theory fails—by, for example, concretely identifying how specified groups of wells harm identified plaintiffs. We decline to "hunt[] for truffles buried in . . . the record" to draw the

concrete links between individual injuries and individual wells that Plaintiffs have neglected to unearth in their own submissions. *See Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) (internal quotation marks omitted). Plaintiffs are free to clarify those connections in future litigation—or, alternatively, establish standing to levy a wholesale challenge against a broader agency action, such as a decision to authorize multiple parcels for leasing that underlies development of a large number of individual wells. *See Ctr. for Sustainable Econ.*, 779 F.3d at 592-93; *WildEarth 2013*, 738 F.3d at 302.

**B.**

Plaintiffs also claim associational standing for their Endangered Species Act challenges. Their members attest that the permits' contributions to climate change will intensify threats to listed habitats and species that they travel to observe and study. The Bureau says Plaintiffs' showing falls short because no affiant asserts a risk of ESA-cognizable harms in the Permian or Powder River Basins; they rely instead on the contribution of the permitted oil and gas development to global climate change that, in turn, will likely affect the listed habitats and species they view and study elsewhere.

The district court did not separately discuss plaintiffs' associational standing to sue under the ESA. Plaintiffs ask us to remand for the district court to consider the issue in the first instance. But the dispute is a legal one subject to our *de novo* consideration. It has been fully briefed here, the relevant pleadings and declarations are in the record before us, and we may affirm the district court's judgment "on any ground supported by the record." *Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021). We accordingly decide the question of Plaintiffs' associational standing for their ESA claims and hold that they have failed to plausibly allege standing.

Like the NEPA and FLPMA claims discussed above, Plaintiffs' ESA claims are procedural, resting on averments that Plaintiffs' members are injured by the Bureau's failure to engage in the required ESA consultation with the Services. An environmental organization may establish associational standing to bring a procedural ESA claim by showing that a failure to consult "demonstrably increased some specific risk of environmental harms that imperil the members' particularized interests in a species or habitat with which the members share a geographic nexus." *Growth Energy*, 5 F.4th at 27 (internal quotation marks omitted).

In their declarations, Plaintiffs' members identify adverse effects of climate change on various covered species and habitats that they visit, observe, and study. For example, Robin Silver frequently visits Mount Graham in Arizona to photograph the Mount Graham Red Squirrel, whose remaining habitat is threatened by drought and wildfires exacerbated by climate change. Silver Decl. ¶¶ 9-14 (J.A. 651-54). Brett Hartl regularly visits the Hawaiian Islands to observe rare birds threatened by the climate-change induced spread of mosquitos that transmit avian malaria. Hartl Decl. ¶¶ 19-23 (J.A. 585-86). And Steven Amstrup researches the movements, distribution, and population dynamics of polar bears who face potential extinction due to climate change's degradation of their Arctic habitats. Amstrup Decl. ¶¶ 11, 23-34, 57-62 (J.A. 659, 662-66, 672-74). Those and other declarations likely suffice to allege the particularized interest in individual species and habitats required for standing.

Plaintiffs assert that each of the challenged wells will add to greenhouse gas emissions that, by contributing to climate change, likely will intensify threats to the climate-imperiled species and habitats their pleadings and declarations identify. Our court's precedent suggests, however, that environmental

plaintiffs cannot demonstrate the required concrete and particularized harm to their interests only by asserting that a challenged government action will contribute to a particular harmful effect of global climate change. *See Growth Energy*, 5 F.4th at 27. Petitioners in *Center for Biological Diversity v. U.S. Dep't of the Interior* (*CBD v. DOI*), 563 F.3d 466 (D.C. Cir. 2009), for example, claimed that approval of new oil and gas drilling on the outer continental shelf of Alaska would emit greenhouse gases known to contribute to climate change likely to harm local "species and ecosystems." *Id.* at 475-76. We concluded that petitioners "lack[ed] standing on their substantive climate change theory" because "climate change is a harm that is shared by humanity at large," and a desire to "prevent an increase in global temperature" is "too generalized to establish standing" even when plaintiffs have a particularized interest in vulnerable species and ecosystems. *Id.* at 475-76, 478.

Plaintiffs counter that in *CBD v. DOI* we rejected only the claim of "substantive" injury caused by an agency action while allowing the petitioners to proceed on their theory of procedural injury. But we similarly held that the plaintiffs in *WildEarth 2013* had standing because they demonstrated "a separate injury in fact not caused by climate change—the harm to their members' recreational and aesthetic interests from *local* pollution"—to ground their challenge to the agency's deficient consideration of the diffuse and unpredictable effects of greenhouse gas emissions. 738 F.3d at 307.

Even assuming an injury resulting from climate change may support standing, plaintiffs must connect the challenged action to that injury. Given that climate change results from the combined effects of greenhouse gas emissions around the globe, plaintiffs resting on injury from climate change must also allege that their personal injury is traceable to the

challenged action and likely redressable by a favorable judicial decision. Here, Plaintiffs' declarations speak generally of the harm to climate-imperiled species and habitats without addressing how those harms flow from the greenhouse gas emissions associated with the wells they challenge. *See, e.g.*, Nagano Decl. ¶ 23 (J.A. 645) (acknowledging that the challenged APDs represent "a fraction of the total greenhouse emissions" from BLM lands and asserting in general terms that the emissions will result "in significant harm to threatened and endangered species"); Silver Decl. ¶¶ 12-16 (J.A. 653-55) (discussing climate change's impact on the Mount Graham Red Squirrel's habitat and generally alleging that the challenged permits will result in "substantial global emissions," without addressing those emissions' link to the harms averred). Even if Plaintiffs have identified qualifying injuries, they have not plausibly alleged that, if EPA were ordered to revisit the specific procedural errors they seek to challenge, it is "substantially probable" that their injuries would be ameliorated. *Growth Energy*, 5 F.4th at 29. Plaintiffs must offer more to establish a justiciable case or controversy.

## IV.

Plaintiff CBD also claims standing to pursue the ESA claims in its own right as an organization, separate from associational standing on behalf of its members. Like an individual, an organization can establish standing by showing "an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020) (internal quotation marks omitted). An organization demonstrates a sufficient injury in fact by alleging a "'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract

social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). However, the "expenditure of resources on advocacy is not a cognizable Article III injury." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (internal quotation marks omitted). We hold that because the Center identifies no harm to its own activities apart from its advocacy, it has failed to demonstrate that it suffered the required injury and therefore lacks organizational standing.

CBD alleges that BLM's failure to engage in ESA consultation has deprived CBD of information about the challenged permits' impacts on threatened species and habitats that would have otherwise been disclosed in the final biological opinion. As a result, to pursue its mission of "getting [species] the ESA protection they need to survive," the Center has had to expend resources pursuing Freedom of Information Act requests for relevant government data with which to advocate for reforms to the ESA consultation process to better protect climate-imperiled species. Hartl Decl. ¶ 14 (J.A. 583). Those injuries are insufficient to support organizational standing.

The Center does not assert an injury to its non-advocacy operations analogous to the harms to animal-rescue and cruelty-prevention activities that supported organizational standing in *American Anti-Vivisection Society* and *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture* (*PETA*), 797 F.3d 1087 (D.C. Cir. 2015). *See also Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (finding standing where plaintiff organizations "rest[ed] their claims on programmatic concerns, not on wholly speculative or purely ideological interests in the agency's action"). In *PETA*, we emphasized that the challenged agency inaction affected the organization's public education program because the agency's failure to produce for birds the inspection

reports the agency routinely generates for other animals whose handling and care it regulates shifted to the plaintiff organization the burden to "investigate and respond to complaints about birds subjected to inhumane treatment, and/or to obtain appropriate and necessary relief for these animals." 797 F.3d at 1095-96. In *American Anti-Vivisection Society*, organizational standing rested on a program of public education, including "How To Guides, webinars, and informational pamphlets that are designed to help shelters and care facilities tend to the needs of birds" left unprotected due to the agency's failure to promulgate statutorily required standards for the humane treatment of birds in captivity. 946 F.3d at 619 (internal quotation marks omitted).

CBD's asserted injuries, by contrast, are limited to issue advocacy. It explains that it must work harder to gather information and expend additional resources to lobby the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protect endangered and threatened species and habitats. Hartl Decl. ¶¶ 9-14 (J.A. 582-84). Unlike the organizations in the decisions on which it relies, CBD does not identify programmatic expenditures it must make to fill the gap left by the Department of the Interior's failure to analyze and propose measures to ameliorate effects on endangered species of climate change caused by the permitted oil drilling. Our conclusion is bolstered by the Supreme Court's recent decision in *FDA. v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which described *Havens Realty*—the foundation of our organizational injury precedents—as an "unusual case" and cautioned against extending it beyond circumstances in which

the challenged action "directly affected and interfered with [a plaintiff's] core business activities." *Id.* at 395-96.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*